**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| EMPLOYERS INSURANCE CO. OF WAUSAU, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. G-08-0069 |
| PENN-AMERICA INSURANCE CO. and PRESTIGE OYSTERS INC., | § § § | |
| Defendants. | § § | |

**MEMORANDUM AND ORDER**

This insurance dispute arises out of personal injuries suffered by a restaurant customer who ate contaminated raw oysters. The customer sued the restaurant and three entities allegedly involved in the distribution chain that brought the oysters from the Gulf Coast of Texas to the Colorado restaurant: Prestige Oysters (the harvester); Shamrock Foods Company, Inc. (the local distributor); and Bon Secour Fisheries (the shipper). The underlying case was settled.

In this federal suit, the insurance company that paid to settle the underlying plaintiff's claims, Employers Insurance Co. of Wausau, seeks reimbursement. Wausau has moved for summary judgment that as a matter of law, it is entitled to recover the money it spent to settle the underlying case. (Docket Entry No. 22). The defendants, Penn-America Insurance Company and Prestige Oysters, Inc., have filed cross-motions for summary judgment that Texas law precludes Wausau's subrogation claims. (Docket Entry Nos. 19, 20).

Based on the pleadings; the motions and responses; the record; and the applicable law, this court denies Penn-America's and Prestige Oysters' motions on the ground that Texas law does not

preclude the subrogation claim.  This court also denies Wausau's motion because the record is inadequate to determine whether, as a matter of law, the underlying plaintiff's injuries resulted from the independent negligent acts of Bon Secour and Shamrock.  A status conference is set for **April 14, 2010**, at 10:00 a.m. to set a schedule to resolve the remaining issues.

The reasons for these rulings are set out in detail below.

## I.    Background

The plaintiff in this suit, Employers Insurance Company of Wausau, issued a commercial general liability policy to Bon Secour.  The defendants are an insurance company, Penn-America Insurance Company, and its insured under a commercial general liability policy, Prestige Oysters. The sales contract between Prestige Oysters and Bon Secour included provisions requiring Prestige Oysters to indemnify and insure Bon Secour against certain liabilities, not including those arising from Bon Secour's own negligence.  Under those contractual indemnity provisions, Penn-America defended not only Prestige Oysters but also Bon Secour after the tender of the defense by Wausau, subject to a reservation of rights.  Just before trial in the underlying case, it became clear that the insurers could not agree to a joint settlement.  Penn-America paid the underlying plaintiff to settle his claims against Prestige Oysters.  Wausau separately paid the underlying plaintiff to settle his claims against Bon Secour and Shamrock.  In this suit, Wausau alleges that it is the legal and equitable subrogee of Bon Secour and Shamrock and seeks reimbursement of the money paid to settle the claims against Bon Secour and Shamrock in the underlying suit.  Wausau alleges Penn-America and Prestige Oysters are liable for breach of contract and also alleges that Prestige Oysters is liable for statutory indemnity under Texas law as a manufacturer of a defective product.

Penn-America and Prestige Oysters moved for summary judgment, asserting that Prestige Oysters is not subject to a statutory duty to indemnify because the statute was recently amended to exempt oysters from the products covered by the statute; the allegations and evidence in the underlying case that Bon Secour and Shamrock were independently negligent preclude any contractual or statutory duty by Prestige Oysters to indemnify for the settlement; and Bon Secour has no rights to which Wausau can be subrogated because it is a "fully indemnified insured." (Docket Entry Nos. 19, 20).  Wausau moved for summary judgment on the basis that Penn-America and Prestige Oysters were primarily liable for the amounts Wausau paid to settle the claims against Bon Secour and Shamrock.  Wausau bases this argument on the Texas statutory indemnity provision that applies to Prestige Oyster as a manufacturer; the indemnity agreement in Prestige Oysters' contract with Bon Secour; Prestige Oysters' contractual obligation to name Bon Secour as an additional insured on Penn-America's policy; and Prestige Oysters' insurance contract from Penn-America, to which Bon Secour and Shamrock are asserted to be third-party beneficiaries.  (Docket Entry No. 22).          The issues raised in the cross-motions are analyzed below.

## A.      The Underlying Suit

In November 2004, Ricardo Gonzalez sustained severe injuries from *vibrio vulnificus* bacteria contained in raw oysters he ate at a Panda Buffet Restaurant in Colorado.  The oysters were allegedly harvested by Prestige Oysters, shipped by Bon Secour Fisheries, and delivered to Panda Buffet by Shamrock Foods.  Gonzales originally sued Panda Buffet, Shamrock, and Bon Secour Fisheries in Colorado state court; Prestige Oysters was added to the suit in an amended complaint.

In the state court suit, the underlying plaintiff filed a third amended complaint asserting claims for breach of implied warranty of merchantability, breach of implied warranty of

wholesomeness of food, breach of implied warranty for fitness for a particular purpose, negligence, negligent failure to warn, negligence per se, product liability for defective product, and product liability for failure to warn.  (Docket Entry No. 19, Appx. Pt. 1, Ex. D).  The claims were asserted against the "Defendants" and Gonzalez asked "for a judgment against the Defendants."  (*Id.*).  The third amended complaint, the live pleading when the case settled, alleged specifically as follows:

(1) "The raw oyster(s) was not of merchantable quality at the time of the sale thereby breaching the warranty of merchantability." (*Id.* at 4).

(2) "The raw oyster(s) was not wholesome or fit for human consumption at the time of the sale thereby breaching the implied warranty of wholesomeness of food." (*Id.*)

(3) "The Defendants impliedly warranted the food (raw oyster(s)) to be fit for a particular purpose (human consumption). . . . The raw oyster(s) was not wholesome or fit for human consumption at the time of the sale thereby breaching the implied warranty of fitness for a particular purpose." (*Id.* at 5).

(4) "The Defendants placed on the market raw oysters for human consumption. . . . The Defendants owed a duty to the Plaintiff to ensure that the raw oysters were fit for human consumption at the time of the sale. . . . The Defendants breached this duty by selling raw oysters that contained vibrio vulnificus that rendered them unfit for human consumption."  (*Id.* at 6).

(5) "Defendants knew or should have known that the consumption of oysters that contain vibrio vulnificus can be harmful or injurious to a consumer. . . . Defendants knew or should have known that the risk of harm or injury from oysters that contain vibrio vulnificus is not obvious to a reasonable consumer. . . . Defendants owed a duty to Plaintiff to warn of the risk of harm or injury associated with the consumption of the oysters. . . . Defendants breached this duty by failing to warn

of the risk of harm or injury associated with the consumption of the oysters. . . . As a direct and proximate result of Defendants' failure to warn the Plaintiff has been seriously injured." (*Id.* at 6–7).

(6) "Defendants owed the Plaintiff a duty pursuant to Colorado's Pure Food and Drug Law . . . to sell/serve food free from deleterious elements or ingredients. . . . As a direct and proximate result of the Defendants' sale of food that was in violation of Colorado's Pure Food and Drug Law . . . the Plaintiff incurred significant permanent injuries." (*Id.* at 7).

(7) "The Defendants were manufacturers/sellers of the oysters and were engaged in the business of selling the oysters for sale, resale, use or consumption. . . . The oysters were defective at the time [they] were sold by the Defendants or left their control.  Defendants had actual knowledge of the defect." (*Id.* at 8).

(8) "The Defendants were manufacturers/sellers of the oysters and were engaged in the business of selling the oysters for sale, resale, use or consumption. . . . The Defendants' failure to provide adequate warnings or instructions rendered the oysters unreasonably dangerous. . . . As a direct and proximate result of the Defendants' failure to warn of the specific risks of harm or injury associated with the consumption of the oysters the Plaintiff incurred significant injuries." (*Id.*).

**B.      The Parties' Contracts**

The sales contract between Prestige Oysters (Seller) and Bon Secour (Buyer) contained a requirement that Prestige Oysters would indemnify Bon Secour and provide insurance on its behalf. The contract stated:

> (2)      Seller agrees to defend, indemnify and hold harmless Buyer and its employees, agents, representatives, directors and customers (individually, an "Indemnitee") from all actions, suits, claims, demands, and proceedings ("Claims"), and any judgments, damages, losses, debts, liabilities, penalties, fines, costs and expenses (including reasonable attorneys fees) resulting therefrom whether arising

out of contract, tort, strict liability, misrepresentation, violation of applicable law and/or any cause whatsoever:

    . . . .

(III) brought or commenced by any person or entity against any Indemnitee for the recovery of damages for the injury, illness and/or death of any person, or loss or damage arising out of or alleged to have arisen out of (a) the delivery, sale, resale, labeling, use or consumption of any product, or (b) the negligent acts or omissions of Seller; provided, however, that Seller's indemnification obligations hereunder shall not apply to the extent that Claims are caused by the negligence of Buyer.

(Docket Entry No. 19, Appx. Pt. 1, Ex. F).

The sales contract between Prestige and Bon Secour also provided that:

Seller's agreement to maintain and provide insurance on behalf of Buyer under Paragraph 3 is a result of the requirement for Indemnity and defense outlined in this paragraph. . . .

3. Seller agrees to maintain in effect insurance coverage with reputable insurance companies covering . . . commercial general liability, including product liability and excess liability, all with such limits are sufficient in Buyer's reasonable judgment, to protect Seller and Buyer from the liabilities insured against by such coverages. Seller's insurance described herein shall be primary and not contributory with Buyer's insurance. Seller shall furnish a certificate evidencing the obligation of its insurance carriers not to cancel or materially amend such policies without thirty (30) days prior written notice to Buyer. In addition, Buyer shall be named as an additional insured using form CO2015 Broad Form Vender's Endorsement or its equivalent with respect to the commercial general liability policy including products liability. . . . All policies shall provide waivers of subrogation in favor of Buyer. The obligation to provide insurance set forth in this paragraph is separate and independent of all other obligations contained in this guaranty and agreement.

(*Id.*).

Penn-America issued a commercial general liability occurrence policy to Prestige Oysters.[1]

(Docket Entry No. 19, Appx. Pt. 1, Ex. A). The Policy included the following exclusion:

b. Contractual Liability

---

[1]   Policy No. PAC6383345, with effective dates of April 20, 2004 to April 20, 2005.

"Bodily Injury" or "property damage" for which the Insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:

(1) That the Insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "Insured contract", provided the "bodily Injury" or "property damage" occurs subsequent to the execution of the contract or agreement. . . .

(Docket Entry No. 19, Appx. Pt. 1, Ex. A at 2).[2]

The Penn-America policy also had a "Contractual Liability Amendments" endorsement that stated:

This insurance does not apply to any claim for damages resulting from the:

1)  sole negligence of the Indemnitee;
. . .
because of "Bodily injury"; "Property damage" and "Personal and Advertising Injury" arising out of any liability assumed under any "insured contract".

(Docket Entry No. 19, Appx. Pt. 1, Ex. C).

Bon Secour was named as an additional insured on the Penn-America Policy issued to Prestige Oysters.  The endorsement adding Bon Secour was effective March 3, 2005.  The endorsement stated:

Section II—WHO IS AN INSURED is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule (Bon Secour), but only with respect to liability for "bodily

---

[2]  An "insured contract" is, in relevant part, "That part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for 'bodily injury' or 'property damage' to a third person or organization.  Tort liability means a liability that would be imposed by law in the absence of any contract or agreement."  (Docket Entry No. 19, Appx. Pt. 1, Ex. A at 14).

7

injury" . . . caused, in whole or in part, by your [Prestige Oysters']
acts or omissions or the acts or omissions of those acting on your
behalf:

A.    In the performance of your ongoing operations; or

B.    In connection with your premises owned or rented to you.

(Docket Entry No. 19, Appx. Pt. 1, Ex. B).

Wausau issued a commercial general liability occurrence policy to Bon Secour Fisheries.[3]

(Docket Entry No. 22, Ex. A-1).

### C.    The Assumption of the Defense in the Underlying Suits

Wausau defended its insured, Bon Secour, under the CGL policy it had issued.  Wausau also

accepted the defense of Shamrock pursuant to its contract with Bon Secour.[4]  Wausau in turn

tendered the defense of Bon Secour and Shamrock to Prestige Oysters and its insurer, Penn-

America, pursuant to the indemnity provisions in the contract between Prestige Oysters and Bon

Secour.  (Docket Entry No. 19, Appx. Pt. 1, Ex. E).  Wausau suggested that Penn-America retain

the counsel who had been representing Bon Secour (and Shamrock) in the underlying suit.  (Docket

Entry No. 19, Appx. Pt. 1, Ex. G).

Penn-America accepted the defense subject to a reservation of rights "to later deny coverage,

seek reimbursement of its costs, and to pursue a declaration from a court of competent jurisdiction

that it does not have a duty to continue the defense or to indemnify you from any claims."  (Docket

Entry No. 19, Appx. Pt. 1, Ex. H at 1).  The April 1, 2005 Penn-America letter assuming the defense

---

[3]    Policy No. TBC-Z91-430438-024, with effective dates of May 1, 2004 to May 1, 2005.

[4]    Bon Secour had previously accepted Shamrock's tender of defense under a contract between Bon Secour
and Shamrock.  Wausau assumed the defense of Shamrock pursuant to that contract.  (Docket Entry No. 19,
Appx. Pt. 1, Affidavit of William V. Bennett, Jr. at 2).

of Bon Secour noted as one of the grounds for the reservation of rights that coverage does not exist if the liability arises out of the negligence of Bon Secour or any other indemnitee. (*Id.* at 7).

Penn-America accepted Bon Secour's recommendation to retain Bon Secour's counsel but noted that the agreement to pay for a separate defense counsel did not waive the conditions or reservations included in the letter. (*Id.* at 8). Penn-America sent a similar letter to Shamrock assuming the defense and containing a reservation of rights. (Docket Entry No. 19, Appx. Pt. 1, Ex. I).[5]

In the fall of 2006, the defendants filed motions for summary judgment in the underlying case. Settlement negotiations continued while the summary judgment motions were pending. In October 2006, the parties cancelled a mediation after the underlying plaintiff stated that he would not settle for less than $1 million. (Docket Entry No. 19, Appx. Pt. 2, Ex. J). On October 24, 2006, the underlying plaintiff made a global settlement demand of $3.5 million. (Docket Entry No. 19, Appx. Pt. 2, Ex. K). On October 26, Bon Secour's counsel suggested offering in the "$50,000 range on behalf of each defendant[]." (Docket Entry No. 19, Appx. Pt. 2, Ex. L). On November 1, Bon Secour's counsel circulated a pretrial report to the other defendants stating, among other things, that if the case proceeded to a jury verdict he did not "believe that any defendant will escape liability." Instead, the "most likely result" was that the plaintiff might be assigned a slight degree of fault; the restaurant defendant would be allocated the greatest amount of fault; and the rest of the fault allocation would be distributed among the remaining defendants—Prestige Oysters, Bon Secour, and Shamrock. (Docket Entry No. 19, Appx. Pt. 2, Ex. M at 5). The pretrial report closed with a

---

[5]  After accepting the tender of defense, Wausau sought reimbursement of $19,648.80 for legal bills paid on behalf of Bon Secour and Shamrock. (Docket Entry No. 22, Ex. A-3).

recommendation to make a formal settlement offer of a minimum of $50,000 each for a  global

settlement of $150,000.  (*Id.* at 6).  Counsel estimated that the potential liability was in the range of

$8 million to $9 million.  (*Id.*).

In the proposed trial management order submitted to the state trial court on November 8, the

underlying plaintiff reiterated that he alleged that "the Defendants failed to remove/eliminate" the

bacteria from the oysters and failed to warn of the risk of serious injury or death from consuming

"untreated" oysters.  (Docket Entry No. 19, Appx. Pt. 2, Ex. N at 2).  The underlying plaintiff

alleged that his injuries were as a "direct result of Defendants' acts or omissions." (*Id.*).  In the trial

management order, Prestige Oysters set out eight defenses, including that it was not the supplier of

the oysters and that the injuries were proximately caused by the restaurant.  (*Id.* at 3).  Bon Secour

and Shamrock separately set out twenty defenses, including that the damages were caused by other

parties, that both Bon Secour and Shamrock provided the proper warnings, and that both complied

with the codes, standards, and regulations applicable to handling oysters.  (*Id.* at 3–5).  When the

proposed trial management order was submitted to the trial court, the defendants' motions for

summary judgment remained outstanding.  (*Id.* at 6).

Also on November 8, Penn-America sent Bon Secour a letter "reaffirming the terms and

conditions of [Penn-America's] original reservation of rights." (Docket Entry No. 19, Appx. Pt. 2,

Ex. O at 1).  The letter continued:

> [Bon Secour] should be aware that there are independent acts of
> negligence being alleged against Bon Secour and Shamrock.  While
> presently continuing with your defense, Penn-America Insurance
> Company maintains its right to deny any indemnity payment for any
> verdict or settlement arising out of those independent acts of
> negligence or your sole negligence.  If negligence is assessed as a
> result of product handling or other separate negligence on the part of
> Bon Secour and Shamrock, Penn-America asserts that it will have no

> obligation to indemnify for such damages and our obligation to
> defend will cease.  In addition, as outlined in the original reservation
> of rights, Penn-America Insurance Company would be looking to
> recoup all costs if such a funding occurs.

(*Id.*).  The letter advised Bon Secour and Shamrock to involve its own insurance carriers for the possibility that damages would be assessed against Bon Secour and Shamrock for their own acts of negligence, as opposed to the fact that they were in the chain of distribution of the oysters, because such damages would be outside the Penn-America Policy coverage.  (*Id.* at 3).

On November 27, 2006, the Colorado trial court denied the defendants' motions for summary judgment on all but two claims.  (Docket Entry No. 19, Appx. Pt. 2, Ex. Q).  The court dismissed the underlying plaintiff's claims for breach of the implied warranty of fitness for a particular purpose and strict liability to the extent that the claims alleged liability for an unreasonably dangerous product.  (*Id.* at 5, 12).  The court denied the motion for summary judgment as to the plaintiff's negligence per se claim, finding a "disputed fact as to whether Prestige, Bon Secour and/or Shamrock held the oysters without proper refrigeration."  (*Id.* at 10).  The court stated that it would "not find at [that] time that defendants did or did not maintain the oysters at the proper temperature through refrigeration during holding and transport."  (*Id.* at 10 n.1).

Trial was set for December 4, 2006.  (Docket Entry No. 19, Appx. Pt. 2, Ex. M at 1).  On November 29, the underlying plaintiff made a settlement demand for $1 million, stating that the offer would expire at noon December 1.  (Docket Entry No. 19, Appx. Pt. 2, Ex. R).  Bon Secour's counsel recommended a counteroffer of $700,000.  (*Id.*).  On November 29, Penn-America sent emails seeking equal contributions to the settlement from Bon Secour's and Shamrock's insurance carriers.  (Docket Entry No. 19, Appx. Pt. 2, Ex. S, Email from Gloria Bell).  Shamrock's counsel responded that the contribution request was an "act of bad faith" and stated that Shamrock would

not contribute to the settlement.  (*Id.*, Email from Peter Houtsma).  The next day, Liberty Mutual, Shamrock's insurer, stated that it would not agree to contribute to settle the underlying case because Wausau had accepted Shamrock's defense and indemnification.  (Docket Entry No. 19, Appx. Pt. 2, Ex. S, Email from Karen Borrego).  Wausau also refused to contribute, alleging that Penn-America's request for contribution was an act of bad faith and a breach of contract.  (Docket Entry No. 22, Ex. A-4, Emails from Vicky Hanneman).  The vice-president of litigation for Penn-America's parent company also sent an email proposing that each insurance company contribute equally to a global settlement, asserting that there were independent allegations of negligence against Bon Secour and Shamrock remaining after the trial court had denied the defendants' summary judgment motions.  (Docket Entry No. 19, Appx. Pt. 2, Ex. S, Email from William Devlin). In the email, the Penn-America representative stated that if the parties could not agree to contribute to a global settlement, Penn-America would settle separately.  (*Id.*).

The parties did not contribute to a global settlement.  Penn-America separately settled the underlying plaintiff's claims against Prestige Oysters for $350,000.  Penn-America refused to pay to settle the claims against Bon Secour and Shamrock but agreed to continue defending them. Shortly before trial, Wausau settled the claims against Shamrock and Bon Secour for $400,000.[6] (Docket Entry No. 22, Ex. A, Affidavit of Peter Russell ¶ 6).  Wausau demanded reimbursement from Penn-America in March and June 2007.  (Docket Entry No. 22, Ex. A, Affidavit of Peter Russell ¶ 6; *id.* Ex. B).  This suit followed.

---

[6]    Penn-America asserts that both settlement amounts were confidential, (Docket Entry No. 19, Appx. Pt. 1, Affidavit of William V. Bennett, Jr. at 4); Wausau stated that the amounts were $350,000 and $400,000 in its complaint, (Docket Entry No. 1 at 6–7).

Wausau seeks reimbursement for the settlement and for the defense costs it paid.  (Docket Entry No. 1).  Wausau asserts that Prestige Oysters breached its contract with Bon Secour by "failing to maintain in effect general liability insurance for the protection of Bon Secour and by failing and refusing to indemnify Bon Secour and Shamrock in the underlying suit," (*Id.* at 8); that Prestige Oysters is liable under the Texas statute imposing indemnity obligations on manufacturers, Texas Civil Practice & Remedies Code § 82.002; and that Penn-America breached its insurance contract with Prestige Oysters "by failing and refusing to indemnify third-party beneficiaries Bon Secour and Shamrock in the underlying suit," (*Id.* at 9).  Alternatively, Wausau asserts equitable subrogation against Penn-America and requests a "declaration of rights" as to the sales and insurance contracts.  (*Id.* at 10).  There is no dispute that the amounts paid to settle were reasonable. The issue is the right to reimbursement.

## III.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact but need not negate the elements of the nonmovant's case.  *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir. 1997).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied,

regardless of the nonmovant's response.  *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008).

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings.  *Duffie v. United States*, --- F.3d ----, 2010 WL 786532, at *7 (5th Cir. 2010).  The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.  *Id.*  The nonmovant must do more than show that there is "some metaphysical doubt as to the material facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to the nonmovant. *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010); *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002).

**IV.    The Motions by Penn-America and Prestige Oysters Seeking Summary Judgment that Texas Law Precludes  Wausau's Reimbursement Claim**

    **A.    The Argument that the Revision to § 82.002 Precludes a Statutory Duty to Indemnify**

A manufacturer has a duty to indemnify under Texas Civil Practice & Remedies Code § 82.002, which states:  "[a] manufacturer shall indemnify and hold harmless a seller against loss arising out of a products liability action, except for any loss caused by the seller's negligence, intentional misconduct, or other act or omission, such as negligently modifying or altering the product, for which the seller is independently liable."  TEX. CIV. PRAC. & REM CODE § 82.002(a).

14

Under this section, a "'[p]roducts liability action' means any action against a manufacturer or seller for recovery of damages arising out of personal injury, death, or property damage allegedly caused by a defective product whether the action is based in strict tort liability, strict products liability, negligence, misrepresentation, breach of express or implied warranty, or any other theory or combination of theories." *Id.* § 82.001(2).  The duty to indemnify: "(1) applies without regard to the manner in which the action is concluded; and (2) is in addition to any duty to indemnify established by law, contract, or otherwise." *Id.* § 82.002(e).

Penn-America and Prestige Oysters argue that a 2007 amendment to the Texas Civil Practice & Remedies Code § 82.004 adding oysters to a list of products exempted from "products liability actions" precludes Wausau's reliance on the statutory duty to indemnify.  Section 82.004 provides:

> In a products liability action, a manufacturer or seller shall not be liable if:
>
> (1) the product is inherently unsafe and the product is known to be unsafe by the ordinary consumer who consumes the product with the ordinary knowledge common to the community; and
>
> (2) the product is a common consumer product intended for personal consumption, such as:
>
>> (A) sugar, castor oil, alcohol, tobacco, and butter, as identified in Comment i to Section 402A of the Restatement (Second) of Torts; or
>>
>> (B) an oyster.

*Id.* § 82.004.  Subsection (B) was added in 2007 because "there [was] no explicit protection for people in the oyster industry from lawsuits which are brought on behalf of plaintiffs who get sick or die as a result of eating oysters."  (Docket Entry No. 19, Appx. Pt. 2, Ex. T, S.B. 791 Author's/Sponsor's Statement of Intent).

The defendants do not dispute that before § 82.004(a)(2)(B) was enacted, oysters were the subject of products liability suits in Texas.  *See Ayala v. Bartolome*, 940 S.W.2d 727 (Tex. App.—Eastland 1997, no writ) (citing the RESTATEMENT (SECOND) OF TORTS § 402A (1965) and holding that there was a disputed fact question as to whether the oysters were in a defective condition and unreasonably dangerous to the plaintiff).  The defendants argue that this insurance coverage dispute, which was filed after § 82.004(a)(2)(B) was enacted, is within the meaning of a "products liability action."  But the defendants' reading of "products liability action" to include an action among insurers commenced after the underlying "products liability action" has been resolved, whether by settlement or other means, is unsupported.  "Products liability action" is an action "against a manufacturer or seller for recovery of damages arising out of personal injury, death, or property damage," not an action against a manufacturer's or seller's insurer  for its failure to honor its insured's statutory or contractual obligation to indemnify.  "Products liability action" is defined to include an action "based in strict tort liability, strict products liability, negligence, misrepresentation, breach of express or implied warranty, or any other theory or combination of theories"; these examples are aimed at possible theories upon which a person could sue for damages arising out of the ingestion of oysters, not at postliability insurance litigation.  The statute is aimed at protecting harvesters and sellers from liabilities under Texas law arising out of the harvest or sale of oysters.  There is no indication from the text of the statute or the legislative history that the legislature intended to protect insurance companies from an allocation of payment for damages that have been incurred in suits outside the state of Texas under non-Texas law.  The defendants' strained reading of the amendment is not persuasive.  Accordingly, the inclusion of "oyster" in § 82.004 does

16

not preclude Wausau's claim.  The defendants' motion for summary judgment on this basis is denied.

**B.      The Argument that Bon Secour Is a "Fully Indemnified" Insured**

Texas recognizes two types of subrogation.  "Contractual (or conventional) subrogation is created by an agreement or contract that grants the right to pursue reimbursement from a third party in exchange for payment of a loss, while equitable (or legal) subrogation does not depend on contract but arises in every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity should have been paid by the latter."  *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 774 (Tex. 2007).  "In either case, the insurer stands in the shoes of the insured, obtaining only those rights held by the insured against a third party, subject to any defenses held by the third party against the insured."  *Id.*  The defendants urge that because Wausau paid to settle the underlying plaintiff's claims, Bon Secour has suffered no damages and is  a "fully indemnified insured," barring the reimbursement claim.  The defendants rely on *Mid Continent Insurance Co. v. Liberty Mutual Insurance Co.*, 236 S.W.3d 765 (Tex. 2007).

In *Mid-Continent*, the defendant in the underlying lawsuit was a covered insured under two comprehensive general liability policies.  *Id.* at 769.  The underlying defendant was a named insured under a policy issued by Liberty Mutual and an additional insured under its subcontractor's policy issued by Mid-Continent.  Both policies provided the insured $1 million in coverage for the underlying suit.  Neither insurer disputed that it owed a duty to defend and to indemnify.  The only issue was the relative amount each would be required to pay in the settlement.  The issue was not whether coverage existed but the relative amount each insurer would be required to pay.  *Id.* at 769–70.

17

During settlement negotiations, the two insurers agreed that a verdict against the defendant insured would be approximately $2 million to $3 million but disagreed on the settlement value of the case. Liberty Mutual estimated the settlement value at $1.5 million. Mid-Continent estimated the settlement value at $300,000 and was willing to pay only half this amount in a settlement. Liberty Mutual eventually agreed at mediation to pay $1.5 million to settle the underlying case. Mid-Continent agreed to pay only $150,000 toward the settlement. Liberty Mutual funded the remaining $1.35 million, paying $350,000 more than its $1 million policy limit. Liberty Mutual reserved the right to seek recovery against Mid-Continent for part of the amount it paid to settle. *Id.* at 770.

Liberty Mutual sued Mid-Continent in state court, seeking reimbursement of half the amount that Liberty Mutual had paid to settle the underlying case. Mid-Continent timely removed to federal court based on diversity jurisdiction. After a bench trial, the district court ruled in favor of Mid-Continent, finding that Liberty Mutual was entitled to recover $550,000 from Mid-Continent based on subrogation. *Id.* Mid-Continent appealed. The Fifth Circuit certified the following questions to the Texas Supreme Court:

> 1. Two insurers, providing the same insured applicable primary insurance liability coverage under policies with $1 million limits and standard provisions (one insurer also providing the insured coverage under a $10 million excess policy), cooperatively assume defense of the suit against their common insured, admitting coverage. The insurer also issuing the excess policy procures an offer to settle for the reasonable amount of $1.5 million and demands that the other insurer contribute its proportionate part of that settlement, but the other insurer, unreasonably valuing the case at no more than $300,000, contributes only $150,000, although it could contribute as much as $700,000 without exceeding its remaining available policy limits. As a result, the case settles (without an actual trial) for $1.5 million funded $1.35 million by the insurer which also issued the excess policy and $150,000 by the other insurer.

18

In that situation is any actionable duty owed (directly or by subrogation to the insured's rights) to the insurer paying the $1.35 million by the underpaying insurer to reimburse the former respecting its payment of more than its proportionate part of the settlement?

2. If there is potentially such a duty, does it depend on the underpaying insurer having been negligent in its ultimate evaluation of the case as worth no more than $300,000, or does the duty depend on the underpaying insured's evaluation having been sufficiently wrongful to justify an action for breach of the duty of good faith and fair dealing for denial of a first party claim, or is the existence of the duty measured by some other standard?

3. If there is potentially such a duty, is it limited to a duty owed the overpaying insurer respecting the $350,000 it paid on the settlement under its excess policy?

*Liberty Mut. Ins. Co. v. Mid-Continent Ins. Co.*, 405 F.3d 296, 310 (5th Cir. 2005).

The Texas Supreme Court examined whether Liberty Mutual could assert a right of contribution or subrogation against Mid-Continent to recover the amount that Liberty Mutual asserted exceeded its proportionate share of the settlement. The court noted that although both insurers had "pro rata" clauses in their policies, under which they agreed to pay a proportionate share of the insured's loss up to $1 million, they did not "contract with each other to create obligations between themselves or to pay each other's proportionate share of [the insured's] loss." 236 S.W.3d at 773. Citing *Traders & General Ins. Co. v. Hicks Rubber Co.*, 169 S.W.2d 142, 148 (1943), the court reaffirmed the principle that a "direct claim for contribution between co-insurers disappears when the insurance policies contain 'other insurance' or 'pro rata' clauses." *Id.* at 772. The court explained:

A pro rata clause operates to ensure that each insurer is not liable for any greater proportion of the loss than the coverage amount in its policy bears to the entire amount of insurance coverage available. The effect of the pro rata clause precludes a direct claim for contribution among insurers because the clause makes the contracts

> several and independent of each other. With independent contractual obligations, the co-insurers do not meet the common obligation requirement of a contribution claim—each co-insurer contractually agreed with the insured to pay only its pro rata share of a covered loss; the co-insurers did not contractually agree to pay each other's pro rata share.

*Id.* (internal citations omitted). Because the pro rata clauses in the insurers' policies precluded a direct claim for contribution between them, and because the insurers did not contract with each other to "create obligations between themselves or to pay each other's proportionate share" of the settlement amount, the court concluded that Liberty Mutual had no right of contribution against Mid-Continent. *Id.* at 773. Even if Liberty Mutual had paid "more than its contractually agreed upon proportionate share," it did so "voluntarily; that is, without a legal obligation to do so." *Id.* at 772. "Thus, a co-insurer paying more than its proportionate share cannot recover the excess from the other co-insurers." *Id.* (citing *Hicks Rubber*, 169 S.W.2d at 148).

The court also concluded that Liberty Mutual had no right to contractual or equitable subrogation against Mid-Continent. In asserting a claim for subrogation, "the insurer stands in the shoes of the insured, obtaining only those rights held by the insured against a third party, subject to any defenses held by the third party against the insured." *Id.* at 774. The *Mid-Continent* court held that Liberty Mutual had no claim of  contractual subrogation because the insured had been fully indemnified and therefore had "no right . . . to enforce Mid-Continent's duty to pay its pro rata share of a loss." *Id.* at 775. Otherwise the insured would have a right to double recovery. *See id.* The court also found that Liberty Mutual had no claim of equitable subrogation against Mid-Continent:

> Equity does not demand a different result here. We hold, therefore, that a fully indemnified insured has no right to recover an additional pro rata portion of settlement from an insurer regardless of that insurer's contribution to the settlement. Having fully recovered its

> loss, an insured has no contractual rights that a co-insurer may assert
> against another co-insurer in subrogation.

*Id.* at 775–76.

In addressing the overpaying insurer's claim that it could assert subrogated contact rights, the court held that after being fully indemnified, the general contractor had no rights to enforce the underpaying insurer's duty to pay a pro rata share of the loss. *Id.* at 775. The court held that the underpaying insurer could not assert a common law right to recovery in part because the overpaying insurer "paid a debt for which it too was *primarily* liable, thus not satisfying the traditional subrogation requirement that the subrogee pay a debt for which another was primarily liable." *Id.* at 776 (emphasis added).

The defendants' reliance on *Mid-Continent* and other cases applying it, such as *Trinity Universal Insurance Co. v. Employers Mutual Casualty Co.*, 592 F.3d 687 (5th Cir. 2010),[7] is misplaced. In *Mid-Continent*, the insurers were *coprimary* insurers, did not dispute that both covered the loss, and were subject to parallel pro rata clauses. In contrast, in this case, Bon Secour, Wausau's insured, was not an additional insured on the Penn-America policy at the time of the occurrence, and Penn-America strenuously denies that Bon Secour is entitled to *any* coverage under its policy. Additionally, there is no evidence that the policies contained pro rata clauses. Courts applying *Mid-Continent* have stressed that it is limited to its facts, *see Arrowood Indem. Co. v. Gulf Underwriters Ins. Co.*, No. EP-08-CV-285-DB, 2008 WL 5686082, at *5 (W.D. Tex. Dec. 19, 2008)

---

[7] The defendants cited to the district court's opinion in *Trinity Universal*. *See* 586 F. Supp. 2d 718 (S.D. Tex. 2008), *rev'd in part*, 592 F.3d 687. That opinion was reversed in part by the Fifth Circuit after the parties submitted their motions and responses. 592 F.3d 687. The court held that the district court incorrectly applied *Mid-Continent* and held that a primary coinsurer could recover in contribution from another coinsurer defense costs paid on the insured's behalf. *Id.* at 695.

("*Mid-Continent* should not be stretched beyond the facts which underlie that case."); *Duininck Bros., Inc. v. Howe Precast, Inc.*, No. 4:06-cv-441, 2008 WL 4372709, at *9 (E.D. Tex. Sept. 19, 2008) ("*Mid-Continent* is a narrow case . . . ."); *Lexington Ins. Co. v. Chi. Ins. Co.*, No. H-06-1741, 2008 WL 3538700, at *12, *21–22 (S.D. Tex. Aug. 8, 2008) (noting that the *Mid-Continent* court relied heavily on the policies' pro rata clauses and applying *Mid-Continent* to bar subrogation after holding that both insurers provided primary insurance and that both policies contained "other insurance" clauses), or have applied it in the context of coprimary insurers with policies containing pro rata clauses, *see Nautilus Ins. Co. v. Pac. Employers Ins. Co.*, 303 F. App'x 201 (5th Cir. 2008) (per curiam) (unpublished).

The defendants' reading of *Mid-Continent* would make statutory or contractual indemnification in Texas unavailable to the insurer of a seller asserting that its acts or omissions did not cause the underlying plaintiff's injury if the seller's insurer assumed the insured's defense and paid to settle the claim. This reading is not supported by the Texas Supreme Court's statements after *Mid-Continent*. *See Frymire Eng'g Co. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140, 145 (Tex. 2008) ("[The allegedly responsible party's] argument that [the settling party] cannot assert equitable subrogation because its indemnity payment was under a voluntary contract would, if accepted and applied to other contracts, be a radical departure from long-settled Texas subrogation law. For instance, insurance policies are contracts, too, and if the hotel's property insurer had paid the hotel for the cost of repairs pursuant to a policy agreement, it would certainly be able to assert an equitable subrogation claim against [the allegedly responsible party]."). Finally, allowing Wausau to seek indemnification as Bon Secour's subrogee produces no risk of double payment to Bon Secour or inequity to Penn-America or Prestige Oysters. Wausau is seeking reimbursement for

payments that, if Bon Secour was not independently liable, it would not have been required to pay under Texas law.  The defendants are not entitled to summary judgment on this ground.

## C.   The Argument that the Allegations of Independent Negligence Against Bon Secour and Shamrock Preclude Prestige Oysters' Indemnity Obligation

The defendants claim that Wausau cannot recover as a subrogee of Bon Secour under either the contract between Bon Secour and Prestige Oysters or under Penn-America's policy coverage for liabilities Prestige Oysters assumed by contract because the complaint filed in the underlying lawsuit alleged that Bon Secour's independent fault caused the plaintiff's injuries.  The contract between Bon Secour and Prestige Oysters requires Prestige Oysters to indemnify Bon Secour but not for liabilities caused by Bon Secour's own negligence.

The fact that the underlying lawsuit complaint contained allegations that the defendants were independently negligent in distributing the oysters, as well as allegations that Bon Secour was liable merely for selling oysters that were contaminated by the acts or omissions of others—including Prestige Oysters—triggered Prestige Oysters' contractual duty to defend Bon Secour.  These allegations of Bon Secour's own negligence, however, do not preclude Bon Secour and its insurer from asserting that Bon Secour was an innocent seller entitled to contractual and statutory indemnity.  Where, as here, the underlying lawsuit allegations clearly made the indemnitee potentially liable, the indemnitor cannot preclude its responsibility unless it proves that the indemnitee was independently liable.  For Prestige Oysters and its insurer, Penn-America, to preclude the statutory or contractual indemnity claim by Bon Secour and its insurer, Wausau, Texas law requires proof of Bon Secour's independent liability.  *See Gen. Motors Corp. v. Hudiburg Chevrolet, Inc.*, 199 S.W.3d 249, 255 (Tex. 2006) (discussing statutory indemnity under § 82.002);

*XL Specialty Ins. Co. v. Kiewit Offshore Servs., Ltd.*, 426 F. Supp. 2d 565 (S.D. Tex. 2006), *aff'd*, 513 F.3d 146 (5th Cir. 2008) (contractual indemnity).

In *General Motors Corp. v. Hudiburg Chevrolet, Inc.*, 199 S.W.3d 249 (Tex. 2006), a truck dealer sued a truck manufacturer, a truck-bed manufacturer, and a truck-bed dealer for indemnity for a settlement paid to the plaintiffs in an underlying personal injury suit.  The underlying suit was based on a collision involving a truck and bed combination that the dealer, Hudiburg, sold to one of the plaintiffs.  GM manufactured the truck's chassis, including its fuel system; Rawson-Koenig manufactured the bed attached to the truck; and B&M Truck Equipment assembled the bed and attached it to the chassis.  *Id.* at 253.  The truck was struck from behind, crossed the median, and collided with an oncoming pickup.  The bed and chassis separated, pulling apart the truck's dual fuel tanks' filler systems.  A fire resulted from the spilled fuel, injuring one driver and killing the other. *Id.* at 252–53.  The surviving driver and his wife, and the deceased driver's statutory beneficiaries sued Hudiburg and GM alleging that "the vehicle, including its fuel system was defective and unreasonably dangerous." *Id.* at 253.  The plaintiffs did not assert claims against Rawson-Koening, the manufacturer of the truck bed, but Hudiburg asserted cross-claims for contribution and indemnity against Rawson-Koenig.  *Id.*  Hudiburg and GM each settled with the plaintiffs, and Hudiburg reserved its right to seek indemnity from GM and Rawson-Koening.  *Id.*

Hudiburg brought a separate suit for indemnity against GM, Rawson-Koening, and B&M under § 82.002, seeking to recover $4.1 million in settlement costs, expenses, attorneys fees, interest, and the cost of the indemnity action.  *Id.*  The trial court granted summary judgment in favor of GM and Rawson-Koening on all but one ground.  *Id.* at 254.  The court of appeals reversed and remanded.  *Id.*

24

The Texas Supreme Court held that Hudiburg did not have a right to indemnity from Rawson-Koening because the underlying plaintiffs' pleadings did not allege that the service body Rawson-Koening manufactured was defective. *Id.* at 257–58. The court also held that the summary judgment evidence did not show that Hudiburg was independently liable for the losses resulting from the defective truck so as to relieve GM of its statutory duty to indemnify other companies in the distribution chain. *Id.* at 260. Instead, the court held that the record evidence did "no more than hint that Hudiburg may have shared responsibility for the plaintiffs' injuries with either or both of the component product manufacturers." *Id.* The court held that GM's settlement in the underlying case did not relieve it of the statutory duty to indemnify others in the distribution chain. Because the court could not "determine to what extent, if at all, Hudiburg defended and settled the plaintiffs' claims even insofar as they may have related to" GM, the court remanded the case to the trial court for further proceedings. *Id.* at 262.

In *Meritor Automotive, Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86 (Tex. 2001), the Texas Supreme Court considered whether allegations of independent fault were sufficient to invoke the independent fault exception to § 82.002(a) or whether proof of fault was required. In *Meritor*, the plaintiff in the underlying suit was injured while trying to open the hood of a leased truck. The plaintiff sued the truck manufacturer, the hood manufacturer, and the truck's owner. *Id.* at 87. The manufacturers settled, and the plaintiff nonsuited his claims against the truck's owner. *Id.* The truck owner had previously asserted an indemnification cross-claim against the manufacturers and both sides moved for summary judgment on the claim. *Id.* The trial court denied the motion for summary judgment filed by the manufacturers and granted the motion filed by the owner, requiring the manufacturers to reimburse the owner's attorney's fees and expenses incurred in defending itself

against the plaintiff and in enforcing its indemnity right. *Id.* at 88.  The court of appeals affirmed. *Id.*  The Texas Supreme Court held that defense of an allegation of a seller's independent negligence was properly considered "a loss arising out of a products liability action." *Id.* at 90.  But a mere allegation that a seller was negligent does not suffice to invoke the exception in § 82.002(a) that a manufacturer is not liable for losses "for which the seller is independently liable." *Id.*  The court clarified that a plaintiff's pleadings are sufficient to invoke a duty to indemnify but that "it must be established that [the] seller's conduct 'caused' the loss" in order to invoke the exception to the § 82.002(a) duty to indemnify. *Id.* at 91.  The court stressed that the legislative history of § 82.002 "confirms that the exception applies only upon a *finding* that the seller was independently liable." *Id.* (emphasis added).  The court held that the manufacturers failed to raise a fact issue that the truck's owner was negligent or that its defense costs were unreasonable and affirmed the summary judgment in favor of the truck's owner. *Id.*

Other case law interpreting § 82.002 makes clear that to invoke the exception to the statutory duty to indemnify, a manufacturer must *prove* the seller's independent culpability; mere allegations in the underlying suit are insufficient. *See, e.g.*, *FLS Miljo, Inc. v. Munters Corp.*, --- F. Supp. 2d ----, No. 3:07-CV-1412-O, 2010 WL 334912, at *4 (N.D. Tex. 2010); *Jackson v. Black & Decker (U.S.), Inc.*, No. 3:06-CV-2005-G, 2008 WL 4923711, at *3 (N.D. Tex. 2008); *Dean's Campin' Co. v. Hardsteen*, No. 01-00-01190-CV, 2002 WL 1980840, at *3 (Tex. App.—Houston [1st Dist.] Aug. 29, 2002, pet. denied).  Courts considering whether to apply the § 82.002(a) independent-liability exception look to the merits of the underlying case to determine whether the indemnitee was in fact independently liable. *See , e.g.*, *FLS Miljo, Inc.*, No. 3:07-CV-1412-O, 2010 WL 334912, at *4–11 (considering, based on written submissions to the court pursuant to an agreement between the

parties, whether the evidence proved the indemnitor's various theories of the indemnitee's individual liability); *Jackson*, No. 3:06-CV-2005-G, 2008 WL 4923711, at *3–5 (denying an indemnitor's summary judgment motion because it had alleged a fact issue but not yet proven that the indemnitee was independently liable); *Advocare Int'l L.P. v. Horizon Labs., Inc.*, No. Civ. 3:04-CV-1988-H, 2005 WL 1832116, at *8 (N.D. Tex. Aug. 2, 2005) (denying a motion for summary judgment because there remained a fact issue as to the proximate cause of the underlying injuries); *Manchester Tank & Equip. Co. v. Engineered Controls Int'l, Inc.*, --- S.W.3d ----, 2009 WL 5155570 (Tex. App.—Waco 2009, no pet. h.) (holding that there was insufficient proof to conclude that either indemnitee was independently liable); *Panatrol Corp. v. Emerson Elec. Co.*, 163 S.W.3d 182, 190–91 (Tex. App.—San Antonio 2005, pet denied) (holding that summary judgment in favor of the alleged indemnitor was improper because the issue of whether the indemnitee was liable for a defectively designed or manufactured product remained to be tried).

The burden is also on the indemnitor to prove the indemnitee's separate negligence in contractual indemnity cases when the contract excludes coverage arising out of the indemnitee's sole or gross negligence.  In *XL Specialty Insurance Co. v. Kiewit Offshore Services, Ltd.*, 426 F. Supp. 2d 565 (S.D. Tex. 2006), *aff'd*, 513 F.3d 146 (5th Cir. 2008), the court considered an insurance dispute arising out of an explosion that killed an employee of a general contractor and another employee of a subcontractor.  The families sued both the general contractor and the subcontractor.  The subcontractor had been carrying an excess liability policy, a commercial general liability insurance policy, and a workers' compensation policy at the time of the occurrence.  *Id.* at 568.  The excess liability insurer refused to defend and indemnify the general contractor, and the commercial general liability insurer tendered a defense to the general contractor.  *Id.*  The

subcontractor settled with one set of claimants for $4 million and the other set for $1 million.  *Id.* at 569.  The general contractor settled with one set of plaintiffs for $4 million.  *Id.*  The subcontractor's excess liability insurer filed a declaratory judgment action seeking a judgment that it had no duty to defend or indemnify the general contractor.  *Id.*  The general contractor filed a claim against the subcontractor and a cross-claim against the excess insurer arguing that the subcontractor had a duty to defend and indemnify under an indemnification provision in the subcontract.  *Id.*  In response to prior motions for summary judgment, the court held previously that the subcontractor had agreed to contractually indemnify the general contractor for the general contractor's alleged negligence and that the excess policy provided coverage for the subcontractor's contractual duty to indemnify.  *Id.*

The general contractor moved for summary judgment that the subcontractor must indemnify it for the entire cost of the settlement payment, investigation expenses, attorneys' fees, and costs. The subcontractor and its excess insurer argued that they were not required to indemnify the general contractor because the general contractor was immune from suit under workers' compensation law. The excess insurer also argued it was not required to indemnify because the employee had been contributorily negligent, and the subcontractor argued that it was not required to indemnify because the general contractor was solely and grossly negligent.  *Id.* at 571.  The court held that a defense of concurrent or contributory negligence to preclude application of an indemnity contract is an affirmative defense and that the subcontractor and its excess insurer had the burden to prove that the general contractor was solely or grossly negligent or that the plaintiff was contributorily negligent. *Id.* at 575.  The court held that the defenses were not raised in pleadings and therefore waived but also held that even if it were to consider the defenses, the subcontractor and its excess insurer failed

to prove that the employee would have been held greater than fifty percent at fault and failed to show that the general contractor was solely negligent or grossly negligent. *Id.* at 576. The court held that, as a matter of law, the general contractor faced potential liability and that the settlement was reasonable, prudent, and in good faith and ordered the subcontractor to indemnify the general contractor for the settlement payment. *Id.* at 577. The Fifth Circuit affirmed. 513 F.3d 146 (5th Cir. 2008).

Even if the underlying case is resolved by settlement, the settling indemnitee may seek reimbursement. *Gen. Motors Corp.*, 199 S.W.3d at 255–56; *see also Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 867 (Tex. 1999) (in case involving statutory indemnity, "[a]n action may be concluded with a settlement, in which no underlying facts are admitted or established and the liability of a defendant seller or a defendant manufacturer is not determined. A seller of a manufacturer's product who is alleged to have sold the product to the plaintiff should not be denied indemnity if it proves that it is innocent but given indemnity if he settles without admitting or denying the fact."); *FLS Miljo, Inc. v. Munters Corp.*, --- F. Supp. 2d ----, No. 3:07-CV-1412-O, 2010 WL 334912, at *4 (N.D. Tex. 2010) ("[T]hese damages would include the costs of settlement because the duty to indemnify does not require a judgment against the seller, as it applies without regard to how the underlying action is concluded.").

In this case, the plaintiff in the underlying litigation alleged that each defendant was negligent. The state trial court denied the defendants' motions for summary judgment, stating that there would disputed issues as to whether Prestige Oysters, Bon Secour, and/or Shamrock "held the oysters without proper refrigeration." The trial court stated that it would decide at the close of the evidence whether to submit all the separate allegations to the jury. The case settled. The allegations

of Bon Secour's independent negligence do not preclude its claims for contractual or statutory indemnity.  The defendants' motion for summary judgment on that ground is denied.

## V.     Wausau's Motion for Summary Judgment that It Is Entitled to Reimbursement As a Matter of Law

### A.     The Argument that Prestige Oysters Has a Contractual Duty to Indemnify Bon Secour

The sales contract between Bon Secour and Prestige Oysters required it to defend and indemnify Bon Secour and Shamrock (as Bon Secour's "customer") from claims and losses for the recovery of damages arising out of the "delivery, sale, resale, labeling, use [or] consumption" of the oysters and for Prestige's acts of negligence.  The sales contract excluded Bon Secour's right to indemnity "to the extent that Claims are caused by the negligence of [Bon Secour]."  (Docket Entry No. 19, Appx. Pt. 1, Ex. F).  Bon Secour's claim that it is entitled to indemnity cannot be resolved on the present record.  Although the record shows that Bon Secour was potentially liable and there is no challenge to the reasonableness of the settlement, the record does not establish whether Bon Secour was, or was not, independently negligent, so as to preclude or require contractual indemnity.[8] Wausau's motion for summary judgment that it is entitled to be reimbursed for the entire amount it spent to settle the underlying plaintiff's claims is denied.

### B.     The Argument that Prestige Oysters Had a Statutory Duty to Indemnify Bon Secour

Under § 82.002, a manufacturer has the duty to indemnify sellers of its product for losses arising out of a products liability action, "except for any loss caused by the seller's negligence."  As set out in detail above, the present record is inadequate to determine that, as a matter of law, Bon

---

[8]     Wausau concedes this reading of the contract language as "[c]onsistent with and practically mirroring Prestige's statutory duty to indemnify."  (Docket Entry No. 22 at 10).

Secour was independently negligent, triggering the exception to the statutory seller's entitlement to indemnity from Prestige Oysters, the statutory manufacturer. *See General Motors Corp.*, 199 S.W.3d at 255–56. The record is also inadequate to determine that, as a matter of law, Bon Secour was entitled to statutory indemnity. Wausau's motion for summary judgment on this ground is denied.

### C.   The Argument that Prestige Oysters Breached its Agreement to Have Bon Secour Named as Additional Insured

The sales contract between Bon Secour and Prestige Oysters required it to maintain commercial general liability insurance and to have Bon Secour "named as an additional insured . . . with respect to the commercial general liability policy including products liability." (Docket Entry No. 19, Appx. Pt. 1, Ex. F). The defendants attached an endorsement to the Penn-America insurance policy adding Bon Secour as a named insured. The endorsement is dated March 3, 2005, outside the policy period for the underlying occurrence. (Docket Entry No. 19, Appx. Pt. 1, Ex. B). There is no evidence in the record that Bon Secour was named an "additional insured" on the Penn-America policy before that date. Prestige Oysters failed to meets its obligation under the sales contract to have Bon Secour named as an additional insured on its commercial general liability insurance.

Prestige Oysters argues that Bon Secour has not suffered any damages from its failure to name Bon Secour as an additional insured because even if Bon Secour were an additional insured on the Penn-America policy, the allegations of Bon Secour's negligence preclude coverage. Prestige Oysters relies on language in the additional insured endorsement that states that the coverage is "only with respect to liability for 'bodily injury', 'property damage' or 'personal and advertising

injury' caused, in whole or in part, by [Prestige Oysters'] acts or omissions or the acts or omissions of those acting on [Prestige Oysters'] behalf." (*Id.*).

The sales contract was clear that Prestige Oysters' obligation to "maintain and provide insurance" was "a result of the requirement for indemnity and defense outlined" in the sales contract. The requirement for indemnity and defense excluded indemnification for losses resulting from Bon Secour's independent acts or omissions. (Docket Entry No. 19, Appx. Pt. 1, Ex. F). The present record does not permit a conclusion that the underlying plaintiff's injuries resulted from Bon Secour's independent negligence. If Prestige Oysters shows that Bon Secour was independently negligent, there would be no contractual indemnity right, and the Penn-America policy would not provide coverage even if Bon Secour had been an additional insured. Bon Secour would suffer damage from the alleged breach of the sales contract obligation to make it an additional insured only if it was not independently liable. Because this cannot be resolved on the present record, summary judgment on Bon Secour's breach of contract claim is denied.

## VI.    Conclusion

The parties' cross-motions for summary judgment are denied. A status conference is set for **April 14, 2010, at 10:00 a.m.** to set a schedule to resolve the remaining issues.

SIGNED on March 31, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge